Ralph **WALTERS**, Plaintiff–Appellee,

v.

**WESTERN STATE HOSPITAL, Ft. Supply, Oklahoma, et al., Defendants,**

and

**Patrick W. Dudley, M.D., and E.B. Lasmarias, M.D., Defendants–Appellants.**

No. 86–2811.

United States Court of Appeals, Tenth Circuit.

Dec. 29, 1988.

Robert A. Nance, Asst. Atty. Gen., Deputy Chief, Federal Div. (Robert H. Henry, Atty. Gen. of Oklahoma, with him, on the brief), Oklahoma City, Okl., for defendants-appellants.

James Craig Dodd (Kaye M. Kirke, also of Craig Dodd & Associates, with him, on the brief), Enid, Okl., for plaintiff-appellee.

Before LOGAN, BARRETT and BRORBY, Circuit Judges.

LOGAN, Circuit Judge.

Defendants Patrick W. Dudley and E.B. Lasmarias appeal the denial of their motion for summary judgment based on the defense of qualified immunity.[1] This suit arose out of plaintiff Ralph Walters' involuntary admission to Western State Hospital (Western), an Oklahoma mental institution at which Dudley and Lasmarias are employed as physicians. Walters was admitted under an Oklahoma law permitting the emergency detention of people in need of medical treatment. Walters brought suit under 42 U.S.C. § 1983 alleging and adducing evidence to the effect, *inter alia,* that he was treated with psychotropic medi-

---

1. Under the collateral order doctrine, the denial of a qualified immunity claim is an appealable "final decision" within 28 U.S.C. § 1291. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 716 (10th Cir.1988).

cation against his will and that he was prevented from communicating with persons outside the institution for seven to ten days. These acts allegedly deprived Walters of privacy and liberty interests protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

State officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also id.* at 818 n. 30, 102 S.Ct. at 2738 n. 30. Whether the officials' conduct was reasonable should be objectively "measured by reference to clearly established law." *Id.* (footnote omitted). The district court held as a matter of law that Walters' constitutional rights were clearly established when he was involuntarily admitted to Western in April 1981, and therefore the physicians were not immune from suit for an alleged violation of those rights.

## I

■ We agree with the district court that Walters' constitutional right to refuse psychotropic drugs was clearly established at the time of his involuntary admission and that Dudley and Lasmarias should have known that their actions infringed upon that right. In 1973, the Supreme Court of Oklahoma identified the principle that "every person has a right to determine what shall be done with his own body." *Martin v. Stratton,* 515 P.2d 1366, 1369

(Okla.1973). In a 1979 opinion, the Oklahoma Supreme Court formally adopted the informed consent doctrine and noted the doctrine's origins as follows:

> "Anglo–American law starts with the premise of thoroughgoing self-determination, each man considered to be his own master. This law does not permit a physician to substitute his judgment for that of the patient by any form of artifice."

*Scott v. Bradford,* 606 P.2d 554, 556 (Okla. 1979) (footnote omitted). In 1980, in *In re K.K.B.,* 609 P.2d 747, 751 (Okla.1980), the Oklahoma Supreme Court held that, absent an emergency, legally competent persons involuntarily committed to mental facilities have the constitutional right to refuse treatment with psychotropic medication.[2] The court began its analysis by noting that it was "time to recognize liberty includes the freedom to decide about one's own health," and that "[t]his principle need not give way to medical judgment." *Id.* at 749. The court stated that "the basic premise of the right to privacy is the freedom to decide whether we prefer to be helped, or to be left alone." *Id.* at 751. This principle led the court to conclude that "[w]ith no emergency present K.K.B. and others similarly situated, based on the constitutional right to privacy, have a right to decide whether they wish to be helped." *Id.* Finally, the court commented on its rationale as follows:

> "If the law recognizes the right of an individual to make decisions about her life out of respect for the dignity and autonomy of the individual, that interest is no less significant when the individual is mentally or physically ill. Because the

**2.** Apparently in response to *In re K.K.B.,* the Oklahoma legislature enacted the following statutory provisions, with an emergency effective date of June 17, 1980:

"A. During the detention periods set forth in this act, or during the time set forth for the precommitment screening examination provided for in Section 6 of this act, appropriate treatment and medication including psychotropic medication may be administered to a consenting individual.

B. Treatment and medication may be administered to a nonconsenting individual upon the written order of a physician who has

personally examined the patient and who finds such medication or treatment is necessary to protect the patient, the facility or others from serious bodily harm, and who so notes in the individual's medication record, with an explanation of the facts leading up to the decision to administer treatment and medication including psychotropic medication."
Okla.Stat.Ann. tit. 43A, § 54.8 (footnote omitted) (current law codified at *id.* § 5–204(A)–(B) (Supp.1989)). On this appeal, defendants do not contend that they conformed to the requirements for administering psychotropic drugs to nonconsenting individuals.

patient will be the one to suffer the consequences she must have the power to make the decision."

*Id.* at 752; *see also Colyar v. Third Judicial Dist. Crt.*, 469 F.Supp. 424, 431–32 (D. Utah 1979) (for person to be involuntarily committed to mental institution, state must show person incapable of making rational decision about acceptance of treatment).

The Oklahoma court in *In re K.K.B.* was not writing on a blank slate. The United States Supreme Court previously had recognized that involuntary commitment to a mental hospital "constitutes a significant deprivation of liberty" requiring due process protection. *See Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). And, two federal district court decisions relied on in *In re K.K.B.*, *see* 609 P.2d at 750–51, also held that competent people have a constitutional right to refuse psychotropic drugs in non-emergency circumstances, and one of these decisions was affirmed on that ground, before April 1981, by the U.S. Court of Appeals for the First Circuit. *See Rennie v. Klein*, 462 F.Supp. 1131, 1144–45 (D.N.J. 1978), 476 F.Supp. 1294, 1307 (D.N.J.1979), *modified and remanded on other grounds*, 653 F.2d 836, 844, 847 (3d Cir. 1981) (en banc) (quoting with approval *In re K.K.B.*), *vacated and remanded for further consideration*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *reaffirmed on remand*, 720 F.2d 266, 269 (3d Cir.1983) (en banc); *Rogers v. Okin*, 478 F.Supp. 1342, 1369 (D.Mass.1979), *aff'd in part and rev'd in part on other grounds*, 634 F.2d 650, 653 (1st Cir.1980) (citing with approval *In re K.K.B.*), *vacated and remanded on other grounds sub nom. Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982); *see also Davis v. Hubbard*, 506 F.Supp. 915, 929 (N.D. Ohio 1980) (recognizing right to refuse psychotropic medication in the absence of emergency as aspect of liberty guaranteed by due process clause).

Noting the exception for emergency situations set out in *In re K.K.B.*, however, Dudley and Lasmarias contend that they are immune from suit because their conduct was the product of professional judgment in an emergency. *See also Youngberg v. Romeo*, 457 U.S. 307, 321–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982).[3] Oklahoma law permits the emergency detention of a "person requiring treatment" based on sworn statements meeting specified requirements. *See* Okla.Stat.Ann. tit. 43A, § 52.1A–C (current law codified at *id.* § 5–207A–C (Supp.1989)). A "person requiring treatment" was defined as either of the following:

"(1) A person who has a demonstrable mental illness and who as a result of that mental illness can be expected within the near future to intentionally or unintentionally seriously and physically injure himself or another person and who has engaged in one or more recent overt acts or made significant recent threats that substantially support that expectation; or

(2) A person who has a demonstrable mental illness and who as a result of that mental illness is unable to attend to those of his basic physical needs such as food, clothing or shelter that must be attended to in order for him to avoid serious harm in the near future and who has demonstrated such inability by failing to attend to those basic physical needs in the recent past; ...."

*Id.* § 3(*o*) (current law codified at *id.* § 1–103(n) (Supp.1989)). Walters was taken into protective custody by police officials and admitted to Western based on the affidavit of one of these officers and a local

---

**3.** In *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985), this court, in the context of pretrial detainees, recognized that "[a]ny decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards." Giving content to this standard, we held that the exercise of professional judgment "requires an evaluation in each case of all the relevant circumstances, including the nature and gravity of the safety threat, the characteristics of the individual involved, and the likely effects of particular drugs." *Id.* In addition, we stated that the "availability of alternative, less restrictive courses of action should also be considered." *Id.; see also id.* at 1396 n. 7.

private physician. Thus, Dudley and Lasmarias claim that even if Walters' right to refuse medication was clearly established in April 1981, Walters was admitted under emergency conditions and they exercised reasoned professional judgment in that emergency. The district court apparently found that there were material issues of fact concerning the existence of an emergency and whether the forced medication was consistent with the exercise of professional judgment. We agree.

This circuit has held that in examining qualified immunity claims on an interlocutory appeal, we "should consider in the light most favorable to the plaintiff all undisputed facts discernible from the pleadings and other materials submitted to supplement them by the time the motion for summary judgment is made." *DeVargas v. Mason & Hanger–Silas Mason Co.,* 844 F.2d 714, 719 (10th Cir.1988) (footnote omitted). After examining the summary judgment material, the court must determine if there is "a triable conflict on facts material to defendants' [qualified immunity] defense." *Id.* In such a situation our task is "not to determine liability on a battle of affidavits, but to determine whether, on the basis of the pretrial record, there exists a conflict sufficiently material to defendants' claim of immunity to require them to stand trial." *Id.*

Based on the record on appeal and Walters' representations of statements contained in various depositions not in the appellate record, but which the defendants do not dispute, we hold that there is a genuine issue of material fact concerning whether a reasonable person, exercising professional judgment and possessing the information before the defendants, would have believed that an emergency existed. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). In addition, there is a fact question whether the forced medication of Walters was consistent with the exercise of professional judgment. *See Bee,* 744 F.2d at 1396 & n. 7. First, the affidavit that served as the basis for Walters' involuntary admission to Western is virtually unintelligible. It states that Walters was "INCORHENT,

HALLUCATING, REPORTS NOT KNOW WHAT HE DID, AND HEARING VOICES TELL HIM THINGS, WOULD NOT TALK WOULD TRY TO WALK OFF AND WO'NT TO KNOW WHY I KNEW HE WHERE HE LIVE HE IS LIFE LONG RES OF DEWEY CO." I R., tab 8/30/83, index at 56. Second, while Walters was brought to Western in a strait jacket, the restraint was soon removed, and Dudley did not see any need for further restraint of any type. *See* Brief of Plaintiff/Appellee at 12. Third, Dudley apparently testified in a deposition that he administered the psychotropic medicine because he anticipated that Walters might become a threat to others some time in the future. *Id.* at 13. Fourth, shortly before the drugs were administered, Dudley recorded in Walters' medical records that the patient was "cooperative, coherent, alert." I R., tab 8/30/83, index at 17. Finally, Lasmarias apparently testified in a deposition that he could not recall ever *not* administering psychotropic medication to patients admitted to Hill 7, the restrictive ward where Walters was housed during the initial period of his confinement. *See* Brief of Plaintiff/Appellee at 15.

## II

We also agree with the district court that Walters' constitutional right to communicate with persons outside the institution was clearly established at the time of his involuntary admission and that Dudley and Lasmarias should have known that their actions infringed upon that right. To be sure, there were no United States Supreme Court or Tenth Circuit cases directly on point on this issue. But the insight of a constitutional scholar is not necessary to conclude that forcibly detaining a person without his consent and holding him incommunicado for a period of seven to ten days implicates that person's constitutionally protected privacy and liberty interests. *Cf. Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980) (per curiam) ("It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some

magnitude."), *cert. denied*, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981). In 1980, the Oklahoma legislature, apparently in recognition of the fundamental due process rights of mental patients recognized by the United States Supreme Court in *Addington* and the Oklahoma Supreme Court in *In re K.K.B.*, passed the following statute applicable to these defendants and covering individuals, like Walters, who are involuntarily detained in mental health institutions:

> "All facilities wherein persons are detained for any purpose under the provisions of this act shall allow such detained person the right to contact a relative, close friend or attorney immediately upon entry into such place of detention."

Okla.Stat.Ann. tit. 43A, § 57.1 (current law codified at *id.* § 5–201 (Supp.1989)).

Indeed, in April 1981, it was so clearly established that the constitutional right to minimally adequate care and treatment encompassed rights of visitation and communication with persons outside the institution that such provisions were routinely included in district court orders affecting institutionalized persons. *See Eckerhart v. Hensley*, 475 F.Supp. 908, 924–25 (W.D.Mo. 1979) (recognizing right in institution where majority of patients were criminally committed); *Evans v. Washington*, 459 F.Supp. 483, 489 (D.D.C.1978) (mentally retarded persons); *Gary W. v. Louisiana*, 437 F.Supp. 1209, 1224, 1228 (E.D.La.1976) (mentally retarded, emotionally disturbed, and physically handicapped children); *Davis v. Watkins*, 384 F.Supp. 1196, 1207–08 (N.D.Ohio 1974) (majority of patients were criminally committed); *Wyatt v. Stickney*, 344 F.Supp. 373, 379–80 (M.D. Ala.1972) (mentally ill persons), *id.* at 387, 399 (mentally retarded persons), *aff'd in part and remanded sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir.1974).

To the extent defendants argue that Walters' seclusion can be justified because it was medically legitimate or therapeutic, *see Doe v. Public Health Trust*, 696 F.2d 901, 904 (11th Cir.1983) (per curiam), this argument proves too much in that Western's undisputed policy was to hold *all* patients incommunicado for seven to ten days. *See* Opening Brief of Defendants/Appellants at 24; Brief of Plaintiff/Appellee at 14, 27. Moreover, the Oklahoma Supreme Court's decision in *In re K.K.B.* recognized that "liberty includes the freedom to decide about one's own health," a right that, absent an emergency, "need not give way to medical judgment." 609 P.2d at 749. We have sympathy for the position of doctors who follow hospital rules. But the rule, if there was one, violates the law, as clearly set forth in the Oklahoma statute above quoted. *Harlow* and *Anderson* require application of an objective standard for measuring qualified immunity. This is an interlocutory appeal, and we are satisfied that it is not an injustice to require defendants to justify their actions as professionally reasonable at a trial. Based on the facts disclosed by the record and represented by the parties, we find that whether Walters' seclusion was justified is a genuine issue of material fact precluding summary judgment.

AFFIRMED.